James BENJAMIN, et al., Plaintiffs,

v.

Michael P. JACOBSON, et al., Defendants and related cases.

75 Civ. 3073 (HB).

United States District Court, S.D. New York.

July 23, 1996.

See also: 923 F.Supp. 517.

Daniel L. Greenberg, John Boston, Sarah Kerr, Dori A. Lewis, Marta Nelson, The Legal Aid Society, Prisoners' Rights Project, New York City, for Plaintiffs.

Paul A. Crotty, Corporation Counsel of the City of New York (Lorna B. Goodman, June R. Buch, Laura A. Chamberlain, Florence A. Hutner, Assistant Corporation Counsel, of counsel), New York City, for Defendants.

Mary Jo White, United States Attorney for the S.D. New York (Sara L. Shudofsky, Assistant United States Attorney, of counsel), New York City, for U.S.

## OPINION AND ORDER

BAER, District Judge:

Defendants have moved for immediate termination of the Consent Decrees and all supplemental orders entered in this action and the six related cases that are encompassed herein [1] based on the recently enacted Prison Litigation Reform Act of 1995 ("PLRA" or "the Act"), Pub.L. No. 104–134, 110 Stat. 1321, §§ 801–810 (Apr. 26, 1996). Plaintiffs oppose the motion on the basis that the Act is superseded by the Federal Rules of Civil

---

**1.** The six related cases are: *Forts v. Malcolm,* 76 Civ. 101 (New York City Correctional Institute for Women), *Ambrose v. Malcolm,* 76 Civ. 190 (Bronx House of Detention for Men), *Maldonado v. Ciuros,* 76 Civ. 2854 (Adolescent Reception and Detention Center), *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 79 Civ. 4913, *Detainees of the Queens House of Detention* for *Men v. Malcolm,* 79 Civ. 4914, *Rosenthal v. Malcolm,* 74 Civ. 4854 (Adult Mental Health Center on Rikers Island). *See* Declaration of Michael P. Jacobson dated June 28, 1996 at 2 n. 1. The Court will refer to all of the consent decrees and supplemental orders as the "Consent Decrees."

Procedure and is unconstitutional.[2] Although the Court's concerns with this new legislation are myriad, I am constrained under the law to uphold it. As the Supreme Court reminds us in the course of upholding the constitutionality of a Social Security eligibility provision:

[I]t is not within our authority to determine whether the congressional judgment expressed in that Section is sound or equitable, or whether it comports well or ill with purposes of the Act.... The answer to such inquiries must come from Congress, not the courts. Our concern here, as often, is with power, not with wisdom.

*Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). Accordingly, the defendants' motion is granted and the Consent Decrees are vacated.

## BACKGROUND

The Consent Decrees in these related cases were entered in 1978–1979. As drafted and agreed to by the parties, and proposed to the Court for its approval, these decrees aimed to ensure that prison conditions became and remained safe and humane. The Decrees address issues that affect individual detainees directly as well as more structural, institutional problems that arise in prison management. Detainees, it should be noted, are those men and women awaiting plea or trial. They have not yet been convicted of anything.

A few brief examples of the most important provisions of the Consent Decrees may be helpful. On the individual level, the Consent Decrees ensure that detainee mail and property are handled properly, and that procedures in concert with constitutional protections are followed during detainee cell and body searches. On an institutional level, the Consent Decrees seek to maintain the physical plant of the jails in a condition safe for human habitation. They mandate that attention be given to vermin and insect control, sanitation, maintenance and refuse removal. Other provisions govern food services to the

detainees and ensure that the detainees are adequately fed while in custody, with food that is prepared and served in a sanitary environment.

The PLRA, which was passed and signed as part of an appropriations bill, deals primarily with prisoners' rights and prison conditions litigation. This decision represents one of the first tests with respect to the constitutionality of the Act. Section 802 of the PLRA amends 18 U.S.C. §§ 3626(a)(1), 3626(b)(2) and (3) and 3626(e) as follows:

(a) Requirements for Relief.—

(1) Prospective relief.—(A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

\* \* \* \* \* \*

(b) Termination of Relief.—

\* \* \* \* \* \*

(2) Immediate termination of prospective relief.—In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

(3) Limitation.—Prospective relief shall not terminate if the court makes written findings based on the record that prospec-

---

**2.** Pursuant to 28 U.S.C. § 2403(a), the Court certified to the United States Attorney General that the constitutionality of the PLRA had been drawn into question in this case and invited the United States to intervene. The United States intervened and submitted a brief in support of the constitutionality of the Act.

tive relief remains necessary to correct a current or ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

\* \* \* \* \* \*

(e) Procedure for Motions Affecting Prospective Relief.—

(1) Generally.—The court shall promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions.

(2) Automatic stay.—Any prospective relief subject to a pending motion shall be automatically stayed during the period—

(A)(i) beginning on the 30th day after such motion is filed, in the case of a motion made under paragraph (1) or (2) of subsection (b); or

(ii) beginning on the 180th day after such motion is filed, in the case of a motion made under any other law; and

(B) ending on the date the court enters a final order ruling on the motion.

■ Retrogression or even harmful aspects of new legislation play little or no role in the Court's assessment of its constitutionality. As now Chief Justice Rehnquist wrote in *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980):

> "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."

*Id.* at 179 n. 12, 101 S.Ct. at 462 n. 12 (*quoting Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979) (footnote omitted in original)).

With that thought in mind a brief historical analysis of the twin concepts of what might be called reform in correctional policy and prison conditions may provide a valuable setting for this decision.

In Colonial times, there were no prisons and certainly no prisons as we know them today. Prisons did not begin to appear until well into the 18th Century. This is not to say the colonists had no philosophy about crime and how to handle perpetrators. In essence, criminals were punished, punished severely and that was that. There was no thought that men and women who had committed a crime could be rehabilitated and go on to live useful lives. Branding on the forehead was a frequent penalty for a first offense; death for a third. The fact that there were no prisons played a large role in the colonists' approach to punishment. In the early 18th Century, we saw the beginnings of our prison system in what were characterized as county jails. Prisoners were placed in rooms or perhaps in a single room; there were no cells and there was no effort to distinguish between or separate men, women or children. For some time and certainly into the second decade of the 18th Century, while there was capital punishment for murder, many serious crimes, including arson, rape and burglary, exacted the forfeiture of property, restitution and relatively brief terms of imprisonment. From the very beginning, conditions in our prisons were marked by overcrowding, fire hazards and poor sanitation. Some of the same conditions which prompted the Consent Decrees in this case and at which the PRLA has taken aim.

Later in the 18th Century in what is known as the age of enlightenment in Europe, the concept of "correctional" reform began to emerge. At the same time, the hazards of prison life became known and changes began to take place. In his volume, *The State of the Prisons,* published in England in 1777, John Howard awakened public opinion with a detailed discussion of the inhuman conditions prevalent in most jails and prisons. The same kinds of problems emerged from Howard's inspection as had plagued the prison business from the beginning. They included poor food or no food; poor ventilation which prompted an increased risk of fire; little or no medical attention and overcrowding.

Following the American Revolution, our new nation embraced the reforms of the enlightenment including attention to correctional reform and to prison conditions. America wanted to begin life as a nation utilizing the most modern concepts in the correctional field and the most modern penitentiaries. Correctional reforms began to appear in new state codes and the theory of reform primarily in the guise of rehabilitation replaced earlier thinking where punishment itself was the only goal. The modern prison emerged during the early decades of the 19th Century and incarceration was viewed as simply one of several correctional goals. It was part of a philosophy that allowed as how "doing time" was not an end in itself. Unfortunately the advent of the modern prison and correctional reform in America failed to have the expected concomitant impact on improved prison conditions, as one author suggests:

> it simply moved corporal punishment indoors where, hidden from public view, it became even more savage ... For the most part, the general public did not know what went on behind prison walls. But it regarded the prison as a form of punishment and believed that the undesirables confined there deserved whatever they got.[3]

Towards the middle of the 19th Century, reform concepts such as parole and the indeterminate sentence emerged and became important correctional tools. The widening use of conditional release and parole resulted in reduced populations in prisons and at the same time was proven in some studies to deter recidivism. Naturally enough, since parole was conditioned on evidence of rehabilitation, prisoners were more amenable to educational and other programs which they were given to understand would accelerate such a finding by the parole board. Parole and conditional release grew up during this period and remained with us for a century until the 1980's when in the federal system at least parole was abolished. Prison conditions varied during the 1800's for the most part

prisons during this period remained overcrowded, dirty and poorly ventilated.

Even early in this century, Kate Barnard, an Oklahoma official, reported as follows on a visit to a Kansas prison:

> Prisoners who failed to dig their quota of three cars of coal per day were punished even further. She found one 17 year old, who had been able to mine only two carloads, chained to the wall of the prison. Other punishments included a form of water torture and "the crib," where inmates were thrown with hands and feet tied and drawn together at the back. In addition to the value of the prisoners' labor, the State of Kansas received 48 cents a day for keeping Oklahoma prisoners and paid about 10 cents a day for meals.[4]

Additional reforms particularly new alternatives to incarceration were initiated at or shortly after the dawn of the 20th Century. They included community service and ideas such as work release, which was first passed in Wisconsin with the Huber Law in 1913 and worked its way east and a similar law having been enacted in New York State some half century later, in 1967. Work release programs permit prisoners at least for minor crimes to work during the day and return to their cell in the evening so as to earn some money and to ease their readjustment back into the community.

With the advent of organized crime and the accompanying violence of the 1920's and 1930's, a new "get tough" policy was spawned and for the most part continues to this day. It is unfair to generalize since at different times during the last half century some states have adapted reforms and improved prison conditions dramatically.

Clearly prison conditions have markedly improved since the Kate Barnard revelations, those changes, especially those within the last 20 years, are in some measure attributable to consent decrees of the type before me on this motion to vacate.

---

**3.** Samuel Walker, *Popular Justice* 70 (1980). Professor Walker's volume has been most helpful in the construction of this brief history of prison conditions.

**4.** *Id.* at p. 149.

For the time being we have settled for a correctional policy that focuses on legislation creating many new crimes with long terms for both the new and the old. Such a "hard time" and longer term policy has, since the inception of our prison system, been accompanied by less attention to prisoners' rights and prison conditions. If this policy had proven effective, it might at least be understandable. It has not.[5] It is interesting to note that the primary result of this policy is the emergence of a growth industry in the prison construction business, state and federal expense budgets for our prisons that have never before reached their current numbers, all at taxpayers' expense, and one million souls in those prisons.[6]

Dostoyevsky wrote in the middle of the 19th Century, "the degree of civilization in a society is revealed by entering its prisons."[7] In short the fact that this legislation, signed as part of a budget bill and in the midst of an election year, passes Constitutional muster is far from the whole story. Far more important is what will happen to prisoners' rights and the conditions in our prisons as a consequence of this legislation.

### LEGISLATIVE HISTORY

While I must examine only those few sections of the PLRA before me, the hearings that examined the bill as a whole are instructive. First it is worth noting that some believe that this legislation which has a far-reaching effect on prison conditions and prisoners' rights deserved to have been the subject of significant debate. It was not. A single Senate hearing before the Judiciary Committee, one substantive House Report, and some floor debate is all we can find. This is so even though Senator Hatch told us that as of January 1994, 244 institutions in 34 jurisdictions were operating under court orders and 24 reported having court-ordered population caps.[8]

The thrust of the criticism which prompted the legislation was that the federal courts had overstepped their authority and were mollycoddling the prisoners in state and local jails. In short, the time had come to let the responsible entities, the municipal and state legislatures, take care of their own correctional facilities. After all, the cost of keeping up with the decrees are state and municipal obligations to be borne by state and municipal taxpayers, why shouldn't they be dictated by state and municipal legislative bodies responsible to their constituents. Senator Abraham made that thought quite clear on the floor of the United States Senate:

> The legislation I am introducing today will return sanity and State control to our prison systems. It will do so by limiting judicial remedies in prison cases and by limiting frivolous prison litigation.[9]

On the cost front, Senator Abraham went on to say:

> People deserve to keep their tax dollars or have them spent on projects they approve. They deserve better than to have their money spent, on keeping prisoners in conditions some Federal judges feel are desir-

5. The most recent study of recidivism available from the Bureau of Justice Statistics, a division of the U.S. Department of Justice, detailed the backgrounds of roughly 700,000 state prisoners in 1991. It found that over 60% of inmates had been previously incarcerated. Further that over 55% had previously been incarcerated within 5 years before their current offense.

6. The Bureau of Prison reports its salary and expense budget for 1993 equalled 1.783 billion dollars; for 1994, 1.952 billion dollars; and for 1995, 2.309 billion dollars. Eight new prisons set to house 16,397 prisoners are under construction and eleven more, housing an additional 13,-112 have been passed and approved by Congress. The one under construction in the metropolitan area will be in Brooklyn at this stage at least, it is more expensive than the others. It will have a

capacity of 1,229 prisoners; each cell will cost over $140,000—more than enough to cover four years of tuition at Harvard University. This trend is apparent in New York and across the country too. These figures are just an indication of that trend.

7. F. Dostoyevsky, THE HOUSE OF THE DEAD 76 (C. Garnett trans. 1957).

8. *Hearings on Prison Reform Before the Senate Comm. on the Judiciary*, 104th Cong. 1st Sess. (July 27, 1995) [hereinafter *Senate Hearings*]. The transcripts from these hearings have not been officially printed yet. The Court has relied on unofficial reports provided by the defendants.

9. 141 Cong.Rec. S14316 (daily ed. Sept. 26, 1995).

able, although not required by any provision of the Constitution or any law.[10]

Again, the alleged problem and one at which the legislation took aim was the theme throughout much of the testimony before the Senate Judiciary Committee hearing that prisons have gotten too comfortable and they have gotten too comfortable at the hands of federal judges.

Senator Kay Bailey Hutchinson of Texas put it this way:

> Prisons exist for the protection of society—not for the comfort and convenience of criminals.... Interference by the federal courts has put the interests of criminals ahead of the interests of victims and law-abiding citizens.[11]

Conversely, Senator Simon joined Senator Kennedy in voicing concern about the proposed legislation and they aligned themselves with the remarks of Associate Attorney General John Schmidt who noted:

> "The constitutional provision enforced most frequently in prison cases is the Eighth Amendment's prohibition of cruel and unusual punishment.... Prison crowding may also be a contributing element in a constitutional violation. For example, when the number of inmates at a prison becomes so large that sick inmates cannot be treated by a physician in a timely manner, or when crowded conditions lead to a breakdown in security and contribute to violence against inmates, the crowding can be addressed as a contributing cause of a constitutional violation." [12]

Senator Hatch again in a statement on July 27, 1995 pretty much caught what is thought to be the temper of the times and to which Congress was responsive when he said:

> Properly understood, prisons serve three fundamental functions: the incapacitation of criminals, the punishment and deterrence of crime, and when possible, the rehabilitation of criminals. Incapacitation is the linchpin on which the others depend—punishment and rehabilitation cannot be accomplished if the criminal is not first incapacitated. If we know nothing else, we know that the criminal who is behind bars is not victimizing other innocent people in society at large.
>
> Punishment is also a vital function of the prison system. Ideally, it instills in the criminal an understanding that breaking society's rules has consequences, and encourages the criminal to reform. The credible threat of serious punishment also should deter persons from committing crimes. Equally important, punishment provides closure and peace of mind to victims of crime, who too often are forgotten by the criminal justice system.[13]

The legislative history goes on to emphasize that "hard time" for convicted men and women is the only way to protect the public and that more hard time will protect the public more. Neal R. Peirce, a syndicated columnist and author, tells us something about how that trend has come to manifest itself:

> Leg-ironed work crews have recently been instituted in Alabama, Florida, Arizona and Wisconsin. Gov. William Weld (R., Mass.) apparently speaks for many when he argues prisons should be 'a tour through the circles of hell,' where inmates should learn only 'the joys of busting rocks.'
>
> Garner, Georgia's new corrections chief, provides a foreboding picture of what that future might be. Wearing a black uniform and black boots like his own riot squad, he personally leads raids on prisons, a canine unit in tow. The prisoners are herded outside so officers can tear up their cells in search of contraband (often smashing prisoners' Walkman radios in the process).[14]

---

10. 141 Cong.Rec. S14418 (daily ed. Sept. 27, 1995).

11. *Senate Hearings,* note 8 *supra.*

12. 142 Cong.Rec. S2298 (daily ed. March 19, 1996) (*quoting Senate Hearings,* note 8 *supra*

(statement of the Honorable John Schmidt, Associate Attorney General of the United States)).

13. *Senate Hearings,* note 8 *supra.*

14. Neal R. Peirce, *But in Its Prisons, Georgia Has Reverted to the Bad Old Days,* Philadelphia Enquirer, July 20, 1996, at 19.

### THE DECLARATIONS

In this matter, each side has submitted extensive declarations along with thousands of pages of exhibits. The exhibits essentially paint a historical survey of the Consent Decrees. The first of such Decrees was entered 18 years ago in 1978 and addressed conditions on Rikers Island and in several jails throughout the City now numbering 16 in all and accommodating today some 16,000 detainees. The conditions that brought about the Consent Decrees are not dissimilar from those that have plagued our nation from the time of our first prisons. They include environmental health and safety concerns and overcrowding. Interestingly, while the City suggests that each consent decree has added to what they conclude is the micro management mania of today, they neglect to evidence much awareness that each consent decree by definition required their imprimatur. Commissioner Michael F. Jacobson, Commissioner of the Department of Correction, by way of explanation, suggests that the City of New York was in some sense coerced into signing the Consent Decrees and what he characterizes as "court ordered" stipulations. There is testimony at the Senate Judiciary Committee hearing from former Attorney General William Barr to the effect that during his tenure, jurisdictions under the aegis of consent decrees were invited to use his good offices to extricate themselves from such burdens. While Texas, Michigan and Philadelphia took him up on the offer, New York did not.[15]

John Boston, in his declaration on behalf of the plaintiffs goes on to dispute the City's position that while there were many allegations of unconstitutional conditions, none were ever proven. He sets forth constitutional violations both with respect to protracted confinement in receiving rooms and overcrowding. See Benjamin v. Sielaff, 752 F.Supp. 140 (S.D.N.Y.1990); Benjamin v. Malcolm, 564 F.Supp. 668 (S.D.N.Y.1983). Further, Mr. Boston points to the 1970's, as the decade during which cases were brought that alleged overcrowding and other unconstitutional conditions in the prisons, one of which resulted in the City closing the Tombs (a Manhattan jail) rather than make the requisite improvements.

The first consent decree followed the Benjamin v. Malcolm trial and was the result of an agreement reached while the matter was sub judice following months of negotiations. Tracing the history further, Mr. Boston's declaration outlines how the City failed to comply with the decrees and that it was as a consequence of those repeated failures that in 1981, a motion was made by the plaintiff to hold the City in contempt. The City did not deny violations of the decree and rather than litigate the contempt motion, the City agreed to fund the creation of what came to be known as the Office of Compliance Consultants (OCC).

With the advent of OCC, the plaintiffs declare that there continued to be "sluggish movement of the project," Declaration of John Boston dated June 12, 1996, at 5 (quoting OCC Third Progress Report 6 (Sept. 23, 1983), and contend that from the get go there was little commitment by the Department of Correction except perhaps at the very top and that any changes that were made were basically cosmetic in nature. The Boston declaration goes on to decry the "stagnate" situation and faltering progress by the City. Thereafter in 1990, the court found it necessary to set out specific steps to be taken by the City in order to achieve compliance with the Consent Decrees. See Benjamin v. Malcolm, 156 F.R.D. 561 (S.D.N.Y.1994) conditions evidencing non-compliance continued and resulted in sanctions, See Benjamin v. Sielaff, 752 F.Supp. 140 (S.D.N.Y.1990).

The City was ordered to close certain of its wooden structures on Rikers and in connection therewith, was apprised of considerable fire safety problems that required prompt attention. The plaintiffs contend that there is still non-compliance and OCC in February 1996[16] reports that non-compliance continues at least in the areas of fire safety, maintenance and sanitation. There continue to be

---

15. *Senate Hearings,* note 8 *supra* (statement of the Honorable William P. Barr, former Attorney General of the United States).

16. The reports are issued approximately every four months.

problems in other areas as well all agree that improvements have been accomplished due primarily to the time and attention provided by the parties and the Federal court.

Commissioner Jacobson in his declaration suggests that with respect to the bulk of the issues covered in the Consent Decrees and monitored by OCC, there have been few, if any, complaints. With respect to the areas of greatest continuing concern, such as fire safety the City has allegedly made operable every existing fire alarm system and has budgeted $82.8 million for further fire safety enhancements in the jails.

Similarly for maintenance and sanitation, the Commissioner opines that with the new automated software system recently installed, maintenance will improve dramatically and with respect to sanitation, "[i]n general the jails are clean." Jacobson Decl. at 9.

One of this Court's major concerns has been with respect to the wood frame modular units which not only leak but in fact may represent fire safety problems as well. The PRLA, according to the Commission, will trim the micro management problem, as well as the cost, and such legislation is long overdue. He contends that consent decrees such as the ones at issue here, "demean[ ] and demoralize[ ] City officials and employees. Worse yet by denying administration action, the Consent Decrees dissipate initiative and creativity." Jacobson Decl. at ¶ 17.

Stripped of hyperbole and taking history into account, the Declarations suggest federal court oversight of prison conditions was valuable. Now with respect to these constitutional guarantees, at least for the present, the challenge is for the City and the Board of Correction to be vigilant and attentive to those guarantees.

## DISCUSSION

As discussed above, defendants motion seeks dissolution of the Consent Decrees currently governing certain conditions in the jails located on Rikers Island and elsewhere in New York City.[17] Defendants rely on the recently effective PLRA which limits certain prospective relief in prison condition litigation and mandates a series of timetables for the duration of prospective remedies after which litigants may seek judicial review to determine if continuing enforcement is required.

■ Plaintiffs oppose the City's motion on the grounds that retroactive application of the PLRA to the Consent Decrees: (1) violates the Rules Enabling Act; (2) violates the separation-of-powers principles embodied in Article III of the Constitution; (3) denies them equal protection of the laws; and (4) denies them due process. The Court addresses these issues in the order listed based on two fundamental canons of interpretation. First, federal courts must consider and decide on a non-constitutional basis wherever possible. Only when a non-constitutional basis on which a decision may be made cannot be found should the Court reach any constitutional questions. *See, e.g., Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985). Second, when deciding constitutional questions, the court must address the narrower grounds for decision first. *See, e.g., Plaut v. Spendthrift Farm, Inc.*, — U.S. ——, ——, 115 S.Ct. 1447, 1452, 131 L.Ed.2d 328 (1995) (*citing Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).

The Court notes at the outset that it declines plaintiffs' invitation to consider § 802 of the PLRA as a whole in determining this motion. Defendants based their motion solely on the immediate termination provision in 18 U.S.C. § 3626(b)(2). Therefore that is the only section currently before the Court. The Court should not and will not reach out to determine the constitutionality of provisions not before it. Thus this decision is devoted in its entirety to 18 U.S.C. § 3626(a)(1), (b)(2), and (b)(3), as amended by § 802 of the PLRA, and does not suggest that the balance of the PLRA is or is not constitutional.

---

17. These institutions house all of the City's detainees, i.e., the men and women awaiting trial on state charges as well as those who have pled guilty and are awaiting sentence and those sentenced and awaiting transportation to other institutions. Currently, there are approximately 20,000 men and women housed in New York City jails. The plaintiff classes in these seven related cases include only pretrial detainees and constitute roughly 80% of the total jail population.

## I. *Rules Enabling Act*

■ The only non-constitutional grounds raised to challenge the immediate termination provision in § 3626(b)(2) is based on the Rules Enabling Act. This Act delegated authority to the Supreme Court to prescribe rules of practice and procedure in the district and circuit courts. 28 U.S.C. § 2072(a). The Act provides further that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." *Id.* § 2072(b). Under this clause, statutes that are in direct conflict with a Federal Rule of Civil Procedure are superseded. *See Griffith Co. v. NLRB*, 545 F.2d 1194, 1197 n. 3 (9th Cir.1976), *cert. denied*, 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 125 (1987); *see also Henderson v. United States*, — U.S. —, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) (holding the service provision in Fed.R.Civ.P. 4 "conflicts irreconcilably" with the service requirements in the Suits in Admiralty Act and therefore supersedes the statutory rule).

■ Plaintiffs argue that § 3626(b)(2), which provides for "immediate termination of any prospective relief," conflicts with Fed. R.Civ.P. 60(b). This Rule gives courts the discretion to relieve a party from a final judgment "upon such terms as are just." However, there is no direct conflict here because the two provisions can coexist. A court may still grant relief under Rule 60(b) on a discretionary basis if a party were to move pursuant to that Rule. In § 3626(b)(2), Congress has provided an alternative mechanism that parties may utilize to modify a final judgment. As there is no direct conflict, the PLRA is not superseded by Rule 60(b). *Cf. United States v. Michigan*, No. 1:84 CV 63, slip op. at 7–8 (W.D.Mich. July 3, 1996) (holding that the PLRA's automatic stay provision in 18 U.S.C. § 3626(e) is not superseded by either Fed.R.Civ.P. 60(b) or 62(b)).

## II. *Separation of Powers*

Article III, § 1 of the Constitution provides that "The judicial Power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."

Plaintiffs argue that retroactive application of the PLRA violates the separation of powers in that it mandates the reopening of final judgments, *see Plaut v. Spendthrift Farm, Inc.*, — U.S. —, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), prescribes a rule of decision without changing the underlying substantive law, *see United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), and unconstitutionally restricts the remedial jurisdiction of the district courts.

### A. *Final Judgments*

■ In *Plaut v. Spendthrift Farm, Inc.*, — U.S. —, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), the Supreme Court reiterated the concept that Congress could not require courts to reopen final judgments. At issue was § 27A of the Securities Exchange Act of 1934 which modified the statute of limitations applicable to securities fraud claims brought under § 10(b) of that Act. Section 27A(b) required courts to reinstate actions that had been dismissed as time-barred under the old statute of limitations. The Supreme Court held this provision unconstitutional because it violated "the text, structure and traditions of Article III." *Id.* at —, 115 S.Ct. at 1452. The Court found that the "judicial Power" gleaned from Article III of the Constitution includes the power to issue conclusive judgments that finally determine a dispute. *Id.* at —, 115 S.Ct. at 1453. Once the Article III court issues a final judgment, that judgment may not be altered by retroactive legislation. *Id.*

While *Plaut* concluded that Congress may not direct courts to reopen final judgments, the parties to this litigation dispute the definition of a final judgment for separation-of-powers purposes. Plaintiffs contend that finality depends solely on the right to appeal. Once the time for an appeal has lapsed, and the matter becomes *res judicata* binding the parties, the judgment is final and cannot be reopened by congressional enactment. Furthermore, even though the Consent Decrees impose injunctive relief, plaintiffs argue Congress may not alter the prospective effects of these judgments because they are based on alleged violations of the plaintiffs' constitutional rights and Congress has no power to

modify the substantive constitutional law underlying the injunctions.

In contrast, defendants argue that the finality inquiry is contextual and depends on the character of the judgment. The rule announced in *Plaut*, defendants contend, applies only to actions at law for damages. Injunctions, such as the Consent Decrees here, entail continuing, supervisory jurisdiction and therefore are not final judgments under *Plaut*. Finally, while Congress cannot change the scope of constitutional rights, defendants contend that it does have the power to limit the remedial jurisdiction of the district courts as it has done in the PLRA. A review of the relevant precedents convinces the Court that defendants are correct.

■ As a constitutional question, the finality inquiry for separation-of-powers purposes involves a two-part jurisdictional analysis. The first part looks to whether the federal courts have jurisdiction over the merits of the complaint. Once the availability of further appeal, either to the courts of appeal or the Supreme Court, has been exhausted or waived, the judgment is no longer open to legislative alteration. *See Plaut*, —— U.S. at ——, 115 S.Ct. at 1457; *Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987); *Axel Johnson Inc. v. Arthur Andersen & Co.,* 6 F.3d 78, 84 (2d Cir.1993); *Johnston v. Cigna Corp.,* 14 F.3d 486, 489 n. 4 (10th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995); *Georgia Ass'n of Retarded Citizens v. McDaniel,* 855 F.2d 805, 813 (11th Cir.1988), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989). The second part considers the character of the relief awarded and whether the federal courts have retained jurisdiction over the remedial orders entered in the case. Where the suit is an action at law for damages and the judgment has become final for *res judicata* purposes, the judgment is no longer subject to congressional enactments. *See Plaut*, —— U.S. at ——, 115 S.Ct. at 1456. Where the judgment imposes an executory decree, though, and the court retains supervisory jurisdiction, the judgment's prospective effects are not final for separation-of-powers purposes. *See Daylo v. Administrator of Veterans' Affairs,* 501

F.2d 811, 818 (D.C.Cir.1974) (holding that vulnerability to legislative alteration "would seem to depend on the character of the compliance called for"); *Western Union Tel. Co. v. International Bhd. of Elect. Workers, Local Union No. 134,* 133 F.2d 955, 957 (7th Cir.1943) ("[T]hough a decree may be final as it relates to an appeal and all matters included or embodies [sic] in such a step, yet, where the proceedings are of a continuing nature, it is not final.").

The seminal case in this analysis is *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856). In 1852, the Supreme Court issued an injunction mandating that a bridge across the Ohio River either be removed or raised because it obstructed the free navigation of the river. The Court also awarded the plaintiff costs. Thereafter Congress passed a statute that specifically stated the bridge at issue was lawful and designated it as a post road. After the bridge was destroyed in a storm, Pennsylvania sought to enjoin its reconstruction, but the Court dissolved the initial injunction based on the new statute. In so doing, the Court distinguished between an action for damages and an equitable decree:

> Now, we agree, if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court. The decree before us, so far as it respect the costs adjudged, stands upon the same principles, and is unaffected by the subsequent law. But that part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance.

*Id.* at 431.

The distinction drawn in the *Wheeling* case has been consistently followed. The Court restated this proposition in *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932):

The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.

Similarly, in *System Federation No. 91, Railway Employees' Department, AFL–CIO v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), the Court held that a district court abused its discretion when it refused to modify a consent decree based on an amendment to the underlying law. The consent decree in *Wright* prohibited union shop agreements which were unlawful under the Railway Labor Act when the decree was entered. Subsequently, however, Congress amended the statute to permit such agreements and the Court held that this change warranted a modification of the consent decree. *See also Plaut,* —— U.S. at ——, 115 S.Ct. at 1459 (noting that legislation may affect "the prospective effect of injunctions entered by Article III courts" (*citing Wheeling* )); *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (holding consent decree may be modified based on significant changes in facts or law); *Daylo,* 501 F.2d at 817 (finding that the judgment in *Wheeling* was "vulnerable to retroactive legislation only to the extent that the remedy chosen—an injunctive decree rather than damages at law—directly affected public rights"); *Class v. Norton,* 507 F.2d 1058, 1061 (2d Cir.1974) (holding that *Wheeling* created a "doctrine of judicial deference to legislative revision of a statute upon which a prospective court order is based"); *Johnston,* 14 F.3d at 495 n. 10; *Georgia Ass'n,* 855 F.2d at 812.

These principles are based on the "historic power of a court of equity to modify its decree in the light of changed circumstances." 11 Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2863, at 336 (2d ed. 1995). As the Court wrote in *Swift:*

> We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent.... Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.

*Swift,* 286 U.S. at 114, 52 S.Ct. at 462, *quoted in Wright,* 364 U.S. at 647, 81 S.Ct. at 371. This authority is now codified in Fed.R.Civ.P. 60(b)(5) which provides for relief from a final judgment where "it is no longer equitable that the judgment should have prospective application." *See* Wright, Miller & Kane, *Federal Practice and Procedure* § 2863.

■ A Rule 60(b)(5) motion, however, does not permit relitigation of the merits of the underlying dispute and is no substitute for an appeal. *See Schildhaus v. Moe,* 335 F.2d 529, 530–31 (2d Cir.1964); 7 James W. Moore, et al., *Moore's Federal Practice* ¶ 60.26[4] (2d ed. 1995). Therefore, Congress may legislate retroactively so as to modify the prospective effects of a judgment that is final for appeal purposes because this does not reopen the merits of the judgment. *Cf. Swift,* 286 U.S. at 119, 52 S.Ct. at 464 ("We are not at liberty to reverse under the guise of readjusting."); *Class,* 507 F.2d at 1063.

■ A judgment is "executory" and involves the "supervision of changing conduct or conditions" within the meaning of *Wheeling, Swift* and Rule 60(b)(5) where it compels a party to perform future acts or requires the court to supervise the relationship between the parties. *Twelve John Does v. District of Columbia,* 841 F.2d 1133, 1139 (D.C.Cir.1988). As the Second Circuit recently noted, "[i]n practical terms, these standards mean that judgments involving injunctions have 'prospective application,' while money judgments do not." *DeWeerth v. Baldinger,* 38 F.3d 1266, 1275 (2d Cir.) (interpreting Fed.R.Civ.P. 60(b)(5)), *cert. denied,* —— U.S. ——, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994).

■ While neither party argues that the Consent Decrees are nonfinal for appeal pur-

poses in that the time to appeal has expired,[18] the Consent Decrees are executory judgments with prospective effects. They impose injunctive relief over which this Court has retained supervisory jurisdiction. For example, the Court regularly issues orders fining the defendants for violating various provisions of the Consent Decrees and has entertained numerous motions regarding larger-scale enforcement and compliance issues. Recently, the Court modified the provisions regarding law library services for detainees in punitive segregation based on a significant change in factual circumstances, see *Benjamin v. Jacobson,* 923 F.Supp. 517 (S.D.N.Y.1996), and the defendants have filed a motion to vacate selected portions of the Consent Decrees that is currently being briefed by the parties.

▪ Plaintiffs seek to distinguish *Wheeling* on the ground that it stands for the narrower proposition that an injunction is vulnerable to retroactive legislation only to the extent that the legislature may alter the law on which the judgment rests. Since the Consent Decrees here are based on allegations of constitutional violations, Congress lacks the authority to modify the substantive legal standards underlying the injunctions.

Plaintiffs construct this argument on the distinction drawn in *Wheeling* and its progeny between public and private rights. All of the cases in which Congress altered the prospective effects of an injunction, plaintiffs contend, involved decrees that were based on statutes in areas where Congress has plenary power to regulate, not in areas of constitutional rights which Congress may not modify, such as prison conditions. For example, *Wheeling* involved the right of navigation along interstate waterways, while the consent decree at issue in *System Federation v. Wright* was based on a labor relations statute. *See also Hodges v. Snyder,* 261 U.S. 600, 602–03, 43 S.Ct. 435, 436, 67 L.Ed. 819 (1923) (noting the public rights/private rights

distinction in a suit to enjoin a consolidated school district that was retroactively legalized by a state statute after an injunction had been issued; the Supreme Court affirmed the dissolution of the original decree based on the new statute). In contrast, the Consent Decrees here are based on alleged violations of the constitutional rights of individual detainees within the plaintiff class. These rights, plaintiffs argue, are private, not public. Thus plaintiffs propose that in determining whether Congress may alter a final judgment, the Court must analyze the character of the relief imposed and the character of the right upon which the relief was based.

Plaintiffs adopt the definition of public rights used by the Supreme Court in determining whether Congress violates the Seventh Amendment when it delegates adjudicatory authority to non-Article III forums, such as administrative agencies. Under this doctrine, public rights are those at issue in cases that " 'arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments,' " *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 51 n. 8, 109 S.Ct. 2782, 2795 n. 8, 106 L.Ed.2d 26 (1989) (*quoting Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932)), or that arise in private disputes based on rights that are closely integrated into a public regulatory scheme. *Id.* at 54, 52 S.Ct. at 293–94.

▪ The public rights doctrine, however, is inapplicable here. When the doctrine was first established in *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1856), which incidentally was decided during the same term as *Wheeling,* the key element was the presence of the United States as a party. While the doctrine has been expanded in more recent cases, this original understanding is relevant to determining the meaning used by the *Wheeling* Court. Under the definition of

---

**18.** As a general rule, parties to a consent decree may not appeal because they are deemed to have waived the right to object to matters within the scope of the judgment. *See, e.g., Nashville, Chattanooga & St. Louis R. v. United States,* 113 U.S. 261, 266, 5 S.Ct. 460, 462, 28 L.Ed. 971 (1885); *New York, by Vacco v. Operation Rescue National,* 80 F.3d 64, 69 (2d Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3017 (June 27, 1996) (No. 95–2086); *Christian Science Reading Room v. City and County of San Francisco,* 784 F.2d 1010, 1017 (9th Cir.1986), *amended by* 792 F.2d 124 (9th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987).

public rights when *Wheeling* was decided, that case involved private, not public rights because the United States was not a party. This distinction is even clearer in *Hodges* which was both based on a state statute and did not involve the United States. Even today, the public rights doctrine is an expression of congressional authority and therefore must be limited to federal statutes.

■■■■■ Plaintiffs' argument that the source of the underlying right is an essential element of the separation-of-powers analysis must be rejected because the doctrine of separation of powers is concerned with the structural allocation of power in the Constitution, rather than the individual claims in a particular action. The separation-of-powers principles embodied in Article III protect the jurisdiction of the courts from congressional abuse and overreaching. *See Plaut,* ─── U.S. at ──── ────, 115 S.Ct. at 1453–56 (providing historical review underlying finality doctrine). The doctrine is a structural safeguard, *id.* at ────, 115 S.Ct. at 1463, that focusses on the relative power of the courts and Congress. *Id.* at ────, 115 S.Ct. at 1457. Article III invests the courts with the power "to say what the law is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and conclusively to decide cases free from legislative review of final judgments. *Plaut,* ─── U.S. at ────, 115 S.Ct. at 1453. Only the character of the relief awarded in a final judgment is relevant to the separation-of-powers inquiry because only that factor, and not the source of the underlying right, implicates the power and jurisdiction of the courts. As the Supreme Court noted in *Plaut,* "The issue here is not the validity or even the source of the legal rule that produced the Article III judgments, but rather the immunity from legislative abrogation of those judgments themselves." ─── U.S. at ────, 115 S.Ct. at 1456.

Perhaps a better explanation of the public/private rights distinction in *Wheeling,* repeated in later cases, is that the Court was merely distinguishing between different types of relief. A close examination of the *Wheeling* decision demonstrates that the Court focused exclusively on the remedy chosen, not the source of the underlying right.

In the first *Wheeling* decision, the Court awarded costs and sustained an injunction. Both of these remedies were predicated on the fact that the bridge violated the public right of free navigation. As the Court held, "In both cases, the private right to damages, or to the removal, arises out of the unlawful interference with the enjoyment of the public right, which as we have seen, is under the regulation of congress." *Wheeling,* 59 U.S. (18 How.) at 431. However, because the award of costs had become final, it was "unaffected by the subsequent law." *Id.* In contrast, the executory decree was subject to legislative revision. *Id.* Had the decision rested on the fact that public rights as defined by the plaintiffs, i.e. rights created under the plenary authority of congressional enactment, been involved, both the damages and the injunction would have been held vulnerable. Thus the crucial distinction for separation-of-powers purposes is the character of the relief, not the character of the complaint.

The D.C. Circuit appears to be the only court that has attempted to define the term "public rights," and that court read the term broadly as referring to the relief granted. In *Daylo,* 501 F.2d at 818, the court examined, *inter alia, Wheeling, Hodges,* and *Wright* and noted that "the judicial decrees at issue called for actions which would have directly affected the rights of many persons not privy to the judgments, i.e., would have trenched upon 'public rights.'" Indeed, after considering its earlier decision in *McGrath v. Potash,* 199 F.2d 166 (D.C.Cir.1952), in which the injunction only affected the parties, the court concluded that "[w]hat appears to unite these cases is that the injunctive decrees at issue were 'legislative' in function, attempting to control the legal status of a variety of future actions which the parties, or others, might or might not wish to take." *Daylo,* 501 F.2d at 818. Thus the public/private rights distinction rests on the public nature of the decree, not the public nature of the suit.

Finally, additional support for this analysis is found in the Tenth Circuit's decision in *Johnston v. Cigna Corp.,* 14 F.3d 486 (10th Cir.1993), *cert. denied,* ─── U.S. ───, 115

S.Ct. 1792, 131 L.Ed.2d 720 (1995). This was a pre-*Plaut* decision that found § 27A(b) of the Securities Exchange Act unconstitutional. In so doing, the court distinguished *Wheeling* and *Hodges* on the ground that "the rights involved were public rights—as opposed to the private rights asserted here—and a judgment declaring a public right may be annulled by subsequent legislation." *Id.* at 492. The securities laws come within Congress' plenary power under the Commerce Clause. Therefore, if a securities fraud action for damages involves private, rather than public, rights, the distinction must not be based on the source of the underlying law. Again what appears dispositive is the character of the relief.

As the Consent Decrees embody executory relief over which the Court has retained supervisory jurisdiction, they are subject to alteration by retroactive legislation. Therefore, this Court finds that the section of the PLRA at issue here, 18 U.S.C. § 3626(b)(2), does not reopen final judgments in violation of the separation-of-powers principles outlined in *Plaut. See Plyler v. Moore,* Civ.A. No. 3:82–876–2 (D.S.C. June 4, 1996) (bench ruling).

### B. *Rules of Decision*

 Plaintiffs also argue that the PLRA violates the rule of *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), because it prescribes a rule of decision without changing the underlying law.

*Klein* involved a suit to recover the proceeds of cotton abandoned by a Confederate sympathizer during the Civil War to United States Treasury Agents. The rebel, V.F. Wilson, later received a presidential pardon and swore an oath of loyalty to the Union. His administrator, Klein, sought recovery of the funds for his estate and the Court of Claims ruled in his favor based on a statute providing for such awards to former members of the Confederacy who were pardoned by the President and swore an oath of loyalty. However, while the case was on appeal to the Supreme Court, Congress passed a new statute mandating that presidential pardons could not be considered as evidence of loyalty, rather that such pardons were con-

clusive evidence of disloyalty and that if judgment had already been rendered the Supreme Court must dismiss the case for lack of jurisdiction.

The Supreme Court rejected the statute because, inter alia, it impermissibly imposed a rule of decision for pending cases. The Court distinguished its decision in *Wheeling* because in that case Congress had left the courts free "to apply its ordinary rules to the new circumstances created by the act." *Id.* at 147.

 *Klein* has been interpreted to hold that Congress may not prescribe a rule of decision for the courts to follow without any independent exercise of their judicial powers. *See United States v. Sioux Nation of Indians,* 448 U.S. 371, 391–92, 100 S.Ct. 2716, 2728–29, 65 L.Ed.2d 844 (1980). To affect the outcome of a pending case, Congress must amend the applicable law. *See Axel Johnson Inc. v. Arthur Andersen & Co.,* 6 F.3d 78, 81 (2d Cir.1993) ("The rule of *Klein* precludes Congress from usurping the adjudicative function assigned to the federal courts under Article III. However, *Klein* does not preclude Congress from changing the law applicable to pending cases."); *Henderson v. Scientific–Atlanta, Inc.,* 971 F.2d 1567, 1573 (11th Cir.1992) (upholding § 27A(a) of the Securities Exchange Act, which was not at issue in *Plaut,* against a *Klein* challenge because "the Act does not require courts to make any particular findings of fact or applications of law to fact"), *cert. denied,* 510 U.S. 828, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993); *see also Robertson v. Seattle Audubon Society,* 503 U.S. 429, 438–39, 112 S.Ct. 1407, 1413–14, 118 L.Ed.2d 73 (1992) (upholding statute against separation-of-powers challenge based on conclusion that the new statute "compelled changes in law, not findings or results under old law" without conclusively interpreting *Klein* ).

Plaintiffs argue that, as in *Klein,* Congress has denied this Court the power independently to decide the present motion. Rather, Congress has prescribed a rule of decision. The Court may only look at the record and determine if there was ever a finding of a constitutional violation. If there was not,

then the Court must vacate the decrees, just as in *Klein* where the Supreme Court was directed to dismiss the suit if it was based on a presidential pardon. Furthermore, plaintiffs contend that Congress did not amend the applicable law because it lacked the authority to alter constitutional rights.

However, while Congress did not amend the substantive law with respect to permissible prison conditions, it did change the law governing the district court's remedial powers. Under the new law, courts must apply the same limitations on relief to consent judgments as to litigated judgments. This restriction is an obvious change. Prior to the PLRA, a court could enter a consent judgment as long as it is within the court's subject matter jurisdiction, comes generally within the scope of the pleadings and furthers the objectives of the law upon which the complaint is based. *Local Number 93, Int'l Assoc. of Firefighters v. City of Cleveland*, 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986); *see also id.* at 525, 106 S.Ct. at 3077 ("Therefore, a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial."). Furthermore, the power to enter the decree carries with it the power to enforce the decree with relief that is broader than that which could be granted after trial. *See Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir.1989).

In *Rufo*, for example, where the consent decree addressed the appropriate remedy after the district court had found a constitutional violation, the Court held that the district court did not abuse its discretion in entering the decree even though it provided more relief that "what a court would have ordered absent the settlement." *Rufo*, 502 U.S. at 389, 112 S.Ct. at 763. The Court also held that when the changed circumstances warrant a modification of a consent decree, the court should not "strive to rewrite a consent decree to the constitutional floor." *Id.* at 391, 112 S.Ct. at 764. Rather, the court should only address the changed circumstances and modify the decree "only to the extent that equity requires." *Id.* In contrast, the PLRA requires the court to vacate prison condition decrees or modify them to the constitutional floor.

Accordingly, since the PLRA "compel[s] changes in law, not findings or results under old law," *Seattle Audubon*, 503 U.S. at 438, 112 S.Ct. at 1413, it does not violate the separation-of-powers principles established in *Klein*.

### C. *Restrictions on Remedial Jurisdiction*

██ Next plaintiffs argue that the PLRA divests courts of remedial jurisdiction to such a degree that the courts are no longer able effectively to vindicate constitutional rights. Article III, § 1 gives Congress the power to "ordain and establish" the lower federal courts and the Supreme Court has held that this clause gives Congress the authority to limit the jurisdiction of the district courts. However, plaintiffs cite several academic theorists and dicta in recent Supreme Court decisions for the proposition that Congress may not completely strip the lower courts of their enforcement powers.

The Supreme Court discussed the power of Congress to control the remedial jurisdiction of the lower federal courts in *Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938). There the Court upheld the Norris–LaGuardia Act which denied federal courts jurisdiction to issue injunctions in labor disputes unless the court made particular findings of fact delineated in the statute. The Court held that "[t]here can be no question of the power of Congress thus to define and limit the jurisdiction of the inferior courts of the United States." *Id.* at 330, 58 S.Ct. at 582.

The Norris–LaGuardia Act is analogous to the PLRA and thus *Lauf* applies here. Under the PLRA prospective relief is only permitted if the court finds that a violation of a federal right exists and that the prospective relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). As in *Lauf*, Congress has conditioned the exercise of a court's remedial jurisdiction on the existence of particular facts that must be demonstrated on the record.

In *Lockerty v. Phillips,* 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943), the Court reiterated the principles expressed in *Lauf. Lockerty* involved a challenge to the Emergency Price Control Act which assigned jurisdiction over disputes arising under that Act to the Emergency Court of Appeals and denied jurisdiction to any other court, state or federal. According to the *Lockerty* Court, "[t]he Congressional power to ordain and establish inferior courts includes the power 'of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good.'" *Id.* at 187, 63 S.Ct. at 1022 (citations omitted).

The Court need not enter the extensive academic debate surrounding the power of Congress to control the jurisdiction of the district courts, however, because it is clear that § 3626(b), the only section directly at issue here, preserves the Court's ability to enforce constitutional rights. Under § 3626(b)(3), a court may not vacate prospective relief if it finds on the record that constitutional violations exist and that the relief is appropriately tailored to remedy the violation. While seemingly cramped by the new legal standards in § 3626(a)(1) and the time constraints imposed in § 3626(e), it is nonetheless fair to say that courts will continue to define the scope of prisoners' constitutional rights, review the factual record, apply judicially determined constitutional standards to the facts as they are found in the record and determine what relief is necessary to remedy the constitutional violations. Thus cases such as *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), and *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), are inapplicable. In those decisions, the Supreme Court interpreted statutes to permit judicial review of constitutional claims in order to avoid the serious constitutional questions that would be raised if the statutes precluded such review.

While one might conclude from a reading of the legislative history that what Congress sought was to deny courts the power to enforce constitutional rights, another reader could conclude that Congress wanted to limit that relief to a minimum. As the House Report found:

The dictates of the provision [in § 3626(a)(1)] are not a departure from current jurisprudence concerning injunctive relief. "In granting injunctive relief, the court's remedy should be no broader than necessary to provide full relief to the aggrieved plaintiff." *McLendon v. Continental Can Co.,* 908 F.2d 1171, 1182 (3d Cir.1990) (citations omitted). This rule also applies to constitutional violations. See *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 2757 [53 L.Ed.2d 745] (1977) (remedy must be related to the condition that offends the Constitution); *Toussaint v. McCarthy,* 801 F.2d 1080, 1086 (9th Cir.1986) (injunctive relief must be "no broader than necessary to remedy the constitutional violation"), *cert. denied,* 481 U.S. 1069 [107 S.Ct. 2462, 95 L.Ed.2d 871] (1987).

H.R.Rep. No. 21, 104th Cong., 1st Sess. 24 n. 2 (1995); *see also Rufo,* 502 U.S. at 389, 112 S.Ct. at 762 ("Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated."); *Lewis v. Casey,* — U.S. ——, ——, 116 S.Ct. 2174, 2183, 135 L.Ed.2d 606 (U.S.1996) ("The remedy must of course be limited to the inadequacy that produced the injury-in-fact that the plaintiff has established."). The Fifth Circuit recently noted that the requirements in § 3626(a)(1) are in accord with that circuit's prior law. *See Williams v. Edwards,* 87 F.3d 126, 133 n. 21 (5th Cir.1996). Indeed, plaintiffs concede that § 3626(a)(1) is similar to the standard for injunctive relief granted on the basis of a litigated judgment. *See* Pl. Mem. at 47 (*citing Toussaint,* 801 F.2d at 1086–87).

What Congress has done here that has changed the law significantly is to apply the standards for a litigated judgment to all judgments, including those entered on consent. Although plaintiffs contend this will prevent any cases from settling, and this view is supported by the testimony of Associate Attorney General John Schmidt before

the Senate Judiciary Committee, *see Senate Hearings,* note 8 *supra,* such policy questions are for Congress to resolve. This Court can only consider whether Congress has acted within its authority or overstepped the restraints imposed by Article III. As the Court does not find that its jurisdiction has been restricted unconstitutionally, its inquiry is complete.

### III. *Equal Protection*

Plaintiffs also attack the PLRA on equal protection grounds, arguing that the Act violates the equal protection component of the Fifth Amendment. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975). This challenge is based on the Act as a whole; plaintiffs contend that only unconstitutional animus could have driven Congress to pass a statute like this that erects such high hurdles for plaintiff's in prison conditions and prisoners rights litigation. Unfortunately, as noted above, the Court is unable to consider the entire Act since much of the Act is not before me. Sections 3626(a)(1), (b)(2), and (b)(3) are all that are at issue here.

■ Equal protection principles recognize that most legislation discriminates between different individuals to advance legislative objectives and that such classification may disadvantage certain groups or individuals. *See Romer v. Evans,* —— U.S. ——, ——, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). The initial inquiry, then looks to the nature of the classification to determine the proper level of scrutiny to be applied to the statute.

■ Plaintiffs' arguments that the PLRA should be reviewed under strict scrutiny are not persuasive. Such scrutiny is applied to laws that utilize classifications that for histor-

ical reasons are considered " 'constitutionally suspect,' " such as race, *see McLaughlin v. Florida,* 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964) (*quoting Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954)), or that burden a fundamental right, such as the right to vote, *see Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 667, 670, 86 S.Ct. 1079, 1081–82, 1083, 16 L.Ed.2d 169 (1966). Plaintiffs concede that pretrial detainees are not a suspect class, but contend that the PLRA burdens the fundamental right of access to the courts. Although defendants apparently agree that this right is constitutional in nature and thus fundamental for equal protection purposes, *see Plyler v. Doe,* 457 U.S. 202, 217 n. 15, 102 S.Ct. 2382, 2395 n. 15, 72 L.Ed.2d 786 (1982), they argue that the sections of the PLRA at issue here do not burden this right as recently defined by the Supreme Court. The prisoner's right of access to the courts has been essentially limited to "a right to bring to court a grievance that the inmate wished to present." *Lewis,* —— U.S. at ——, 116 S.Ct. at 2181; *see also id.* at ——, 116 S.Ct. at 2182 (holding right of access to courts only requires that prisons provide inmates with the tools needed "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement"). The provisions granting immediate termination of prospective relief in the PLRA do not implicate this right of initial access to commence a lawsuit. Therefore, strict scrutiny is inappropriate.[19]

■ Laws that do not burden fundamental rights or target suspect classes, are granted a strong presumption of constitutionality and will be upheld if there is a rational relationship between the disparate treatment and a legitimate governmental purpose. *See Heller v. Doe,* 509 U.S. 312, 319–20, 113 S.Ct.

---

**19.** Plaintiffs also argue that given the fundamental nature of the rights at stake, intermediate scrutiny is proper. Such scrutiny has been applied to legislative classifications based on gender and illegitimacy. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (gender); *Mills v. Habluetzel,* 456 U.S. 91, 98–99, 102 S.Ct. 1549, 1554–55, 71 L.Ed.2d 770 (1982) (illegitimacy). However, plaintiffs have not provided any analysis that demonstrates a valid analogy

between these classifications and a classification based on incarceration status.

At oral argument, plaintiffs also proposed that the Supreme Court has in fact developed a third category of heightened scrutiny which can be roughly called rational review plus. Plaintiffs argued that the Court has applied this standard to legislation that burdens individual, rather than economic, rights. However, plaintiffs provided no specific support for this proposition.

2637, 2642–43, 125 L.Ed.2d 257 (1993). The rational relationship test is applied to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer,* —— U.S. at ——, 116 S.Ct. at 1627. However, the Supreme Court has repeatedly emphasized that "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller,* 509 U.S. at 319, 113 S.Ct. at 2642 (*quoting FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993)). Therefore, "[i]n the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer,* —— U.S. at ——, 116 S.Ct. at 1627.

■■■■■■ Under rational basis review, the Court first seeks any legitimate purpose for the statute. Legislative classifications "'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Heller,* 509 U.S. at 320, 113 S.Ct. at 2642 (*quoting Beach Communications,* 508 U.S. at 313, 113 S.Ct. at 2101). Furthermore, "'the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Id.* (*quoting Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S.

356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)). Next, the Court considers whether the statute is reasonably related to the governmental interest. Mathematical precision, however, is not required. Rather, "courts are compelled under rational basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id.* at 321, 113 S.Ct. at 2643; *see also United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 175, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980).

Plaintiffs argue that Congress was motivated solely by animus towards prisoners when it enacted the PLRA and therefore the statute lacks any rational basis. They rely primarily on the Supreme Court's recent decision in *Romer v. Evans,* —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), striking down Colorado's Amendment 2.[20] Amendment 2 prohibited Colorado or any of its political subdivisions from enacting or enforcing any law that protected men and women from discrimination on the basis of their sexual orientation. Thus Amendment 2 barred all governmental action, legislative, executive or judicial, at any level that protected the burdened class. *Id.* at ——, 116 S.Ct. at 1623.

Central to the Court's analysis in *Romer* was the breadth of the disadvantages imposed by Amendment 2. The Court noted the "sweeping and comprehensive" changes in the legal status of gays and lesbians under Amendment 2, and described in detail how

---

**20.** In addition to *Romer,* plaintiffs point to several cases in which the Supreme Court struck down state laws that impermissibly discriminated against criminal defendants and sentenced inmates. In *James v. Strange,* 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972), the Court invalidated a Kansas statute that provided for recoupment of legal fees expended for the representation of indigent criminal defendants but denied these individuals the protections afforded to other civil judgment debtors. Even though the Court recognized that recoupment of counsel costs may be a legitimate interest, the Court found that the classification lacked any rationality. Instead, the Court found that the law "embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." *Id.* at 142, 92 S.Ct. at 2035. Similarly, in *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), the Court rejected a New Jersey statute that provided

different procedures for the civil commitment of mentally ill incarcerated individuals at the end of their prison terms than for all other individuals. Finally, in *Rinaldi v. Yeager,* 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), the Court struck down a New Jersey statute that required sentenced inmates to repay the state for the costs of a trial transcript used on an appeal. The statute applied only to incarcerated convicts, not to those sentenced to pay a fine, who received a suspended sentence or who were placed on probation. The Court found that this classification violated the Equal Protection Clause. *Id.* at 311, 86 S.Ct. at 1501.

What unites these cases is that none of the statutes were rationally related to the advancement of a legitimate government interest. However, as discussed below, they are not directly applicable here because the PLRA is rationally related to a legitimate government interest and therefore survives rational basis review.

the Amendment singled out this group for disfavored treatment "with respect to transactions and relations in both the private and governmental sphere." *Id.* at ——, 116 S.Ct. at 1625. The Court held that the Amendment "is itself a denial of equal protection of the laws in the most literal sense" because it declared that "in general it shall be more difficult for one group of citizens than for all others to seek aid from the government." *Id.* at ——, 116 S.Ct. at 1628. In addition, the Court found that the breadth of the Amendment was so discontinuous with any of the proposed government interests that could be advanced that there was no rational relationship between the State's ends and the means chosen to further them. *Id.* at ——— ——, 116 S.Ct. at 1628–29. Instead, the classification appeared to be driven solely by animus, "undertaken for its own sake," and therefore was unconstitutional. *Id.* at ——, 116 S.Ct. at 1629.

■ Although the PLRA also singles out a unique group for particular treatment, it does not violate the principles set forth in *Romer.* This Act is sufficiently narrower in scope. In addition, the Court must conclude that the PRLA is a properly tailored approach to further legitimate congressional objectives.

First, the PLRA only limits the authority of the judiciary, rather than all three branches of government. Although the current political environment makes it unlikely that the legislature or executive branches would be receptive to calls for prison reform from prisoners themselves, these branches remain free to protect the interests of prisoners. More importantly, unlike Amendment 2 which imposed a complete prohibition on the enforcement of the rights of certain men and women, the PLRA does not bar judicial enforcement of prisoners' federal rights. As discussed above, § 3626(b)(3) specifically permits courts to sustain their remedial orders if the court finds that violations have not been fully corrected and that the relief remains necessary. Therefore, in the PLRA, Congress did not "deem a class of persons a stranger to its laws." *Romer,* —— U.S. at ——, 116 S.Ct. at 1629.

The PLRA also passes the traditional rational relationship requirements of equal protection analysis. The law is supported by plausible legitimate government interests and the means chosen to advance these goals are rationally designed.

The Court notes at the outset that the legislative history suggests that there was significant animosity towards prisoners in Congress. The debates on the Senate floor appear to be more rhetoric than reason and hardly extensive. In addition, it is important to note that the plaintiffs here, as pretrial detainees, may not be punished. *See Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Therefore the long diatribes on the Senate floor about the importance of punishment do not provide a legitimate interest as applied to the plaintiff class.

■ There are, however, legitimate interests that Congress could and probably did seek to advance in the PLRA. So long as there exists a single, reasonably conceivable basis that is legitimate, the Court under rationale basis review must conclude that Congress sought to advance that goal and uphold the statute. *See Heller,* 509 U.S. at 320, 113 S.Ct. at 2642–43. As defendants argue, Congress could have been motivated by a concern that federal courts had ignored the proper limits that federalism principles impose on federal court supervision of state and local prisons. In the PLRA, Congress sought to ensure that federal courts return control over prison management to democratically accountable state and local governments as soon as federal court supervision became unnecessary to remedy a demonstrated, ongoing constitutional violation. Congress could also have wanted to create a uniform national standard for consent and litigated judgments based on a belief that consent judgments, even though agreed to initially, imposed severe burdens on states and local governments and that these burdens exceeded what was constitutionally required. These are legitimate interests.

In addition, although it is not required that Congress specifically articulate its rationale on the record, *see Heller,* 509 U.S. at 320, 113 S.Ct. at 2642–43, there is support for these claimed interests in the legislative history.

The Senate Judiciary Committee held hearings at which experienced law enforcement officials discussed the special burdens imposed by federal court consent decrees. *See Senate Hearings,* note 8 *supra.* As a consequence, I am constrained to conclude that plaintiffs have failed to carry their burden of disproving every possible basis that could support the statute.

The PLRA is also rationally related to the advancement of these goals. Congress was concerned that federal courts had maintained jurisdiction over consent decrees that provided relief beyond what the constitution required. In an effort to combat this, Congress mandated that defendants have the right to seek judicial review of the consent decrees that had been entered without any finding of an actual violation of a federal right and any consideration of whether the relief granted was narrowly tailored to address that violation. 18 U.S.C. § 3626(b)(2). If the Court finds that violations do exist and the relief is appropriately tailored, the relief can continue or, if it is not so tailored, it can be modified to meet the new standards of the Act. *Id.* § 3626(b)(3). This is plainly a rational mechanism for obtaining congressional objectives.

Indeed, plaintiffs do not propose an alternate method. Rather, they argue that the Act is not rationally related to any federalism concerns because it is limited to prison conditions litigation and does not apply to other types of consent decrees. However, Congress may determine that the problems of prison conditions consent decrees involve unique issues that are more pressing and in need of reform. Equal protection principles do not require that the remedies available for violations of different rights be identical.

In *Crawford v. Los Angeles Board of Education,* 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), the Supreme Court upheld an amendment to the California constitution that is analogous to the PLRA. This amendment, known as Proposition 1, prohibited state courts from granting relief in school desegregation cases that went beyond what federal courts would award under the Fourteenth Amendment. In rejecting the argument that the state courts must be per-

mitted to award the same relief for all violations of state constitutional rights, the Court held that "[r]emedies appropriate in one area of legislation may not be desirable in another. The remedies available for violation of the antitrust laws, for example, are different than those available for violation of the Civil Rights Acts." *Id.* at 542, 102 S.Ct. at 3220. Thus the state did not create a "dual constitution" when it chose "to go beyond the requirements of the Federal Constitution in some areas but not others." *Id.* at 542 n. 28, 102 S.Ct. at 3220 n. 28. Indeed, the Court held that "[i]t would be paradoxical to conclude that by adopting the Equal Protection Clause of the Fourteenth Amendment, the voters of the State thereby had violated it." *Id.* at 535, 102 S.Ct. at 3217. Similarly, here the PLRA sets a uniform standard for relief for litigated and consent judgments in prison conditions litigation cases. As the standard for litigated judgments set by the Supreme Court is plainly constitutional, Congress could not have acted unconstitutionally in limiting enforcement of consent decree relief to the same standard. Furthermore, as in *Crawford,* nothing required Congress to set the same rules for all types of litigation.

The Supreme Court's decision in *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 175, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980), is also instructive. There Congress passed a statute to phase out the ability of retired railroad workers to receive both social security and railroad retirement benefits. Under the statutory scheme, railroad employees were classified based on their length of service in the industry, whether they were connected with the industry at the changeover date, and whether they had retired as of the changeover date. The Court upheld the classification under rational basis review. "Because Congress could have eliminated windfall benefits for all classes of employees, it is not constitutionally impermissible for Congress to have drawn lines between groups of employees for the purpose of phasing out those benefits." *Fritz,* 449 U.S. at 177, 101 S.Ct. at 460. As for the rational tailoring requirement, all the Court demands is that Congress not act in "a patently arbitrary or irrational way." *Id.* at

176–77, 101 S.Ct. at 460. Likewise, here Congress could have modified the standards for consent decrees in all types of cases, but nothing required it to do so. Therefore, Congress' determination to single out prison reform litigation was within its power and judging from the temper of the times not a surprise.

Accordingly, application of § 3626(b)(2) to the Consent Decrees does not deny plaintiffs equal protection of the laws.

## IV. *Due Process*

Plaintiffs claim that retroactive application of the PLRA denies them due process because such application violates the "vested rights" doctrine and the limitations placed upon Congress' ability to affect contracts.

### A. *Vested Rights*

Plaintiffs argue that the Consent Decrees are vested rights that Congress may not alter by legislation without violating their due process rights. Defendants respond that the Consent Decrees are not vested rights because they include prospective relief that may be modified.

■ In *McCullough v. Virginia,* 172 U.S. 102, 123–24, 19 S.Ct. 134, 142, 43 L.Ed. 382 (1898), the Supreme Court held that:

It is not within the power of a legislature to take away rights which have been once vested by judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of the legislature to disturb the rights created thereby ceases.

Thus the vested rights doctrine is based on the proposition " 'that rights fixed by judgment are, in essence, a form of property over which legislatures have no greater power than any other [property].' " *Axel Johnson Inc.,* 6 F.3d at 83 (*quoting Georgia Ass'n,* 855 F.2d at 810)) (alteration in original); *see also Johnston,* 14 F.3d at 490; *Tonya K. by Diane K. v. Board of Education of Chicago,* 847 F.2d 1243, 1247–48 (7th Cir.1988).

The principle that parties have vested rights in a court judgment is essentially the due process analog of the separation-of-pow-ers doctrines discussed in *Plaut.* Indeed, before *Plaut* was decided, the vested rights doctrine was described as having two components. One is the due process component on which plaintiffs rely here. The second is the separation of powers component that was later relied on in *Plaut. See, e.g., Axel Johnson Inc.,* 6 F.3d at 83–84; *Johnston,* 14 F.3d at 490–91; *Georgia Ass'n,* 855 F.2d at 810; *Tonya K.,* 847 F.2d at 1247.

■ Therefore, the analysis under *Plaut* is fully applicable here. Both doctrines are based on the finality of the underlying judgment. Plaintiffs do not have any vested rights in the prospective effects of the Consent Decrees because they are not final judgments within the scope of the vested rights doctrine. *See Williams,* 87 F.3d at 131 ("[I]t is well settled that consent decrees once entered remain dynamic."). Accordingly, application of the PLRA does not deny plaintiffs due process of law.

### B. *Impairment of Contracts*

Next, plaintiffs contend that application of the PLRA to the Consent Decrees would unconstitutionally impair their contracts with the defendants. Although defendants argue that for purposes of the vested rights doctrine consent decrees are not actually contracts, *see* Def.Mem. at 53, they apparently concede that consent decrees are sufficiently contractual in nature to fall within the Due Process Clause. *See Rufo,* 502 U.S. at 378, 112 S.Ct. at 757 ("A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature."); *Local Number 93,* 478 U.S. at 519, 106 S.Ct. at 3073 ("[B]ecause their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts.").

■ The Supreme Court set forth the standard of review of federal legislation that impairs private contractual relations in *National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.,* 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). The Court first examines the statute to determine if it alters contractual obligations to such a degree that the modification rises to

the constitutional level. *Id.* at 472, 105 S.Ct. at 1455. If that standard is satisfied the Court must examine the statute more closely. However, "[w]hen the contract is a private one, and when the impairing statute is a federal one, this next inquiry is especially limited, and the judicial scrutiny quite minimal. The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and 'establish that the legislature has acted in an arbitrary and irrational way.'" *Id.* (citations omitted).

■ Plaintiffs' argument that the PLRA should be subjected to a form of heightened scrutiny is not well taken. Where the federal government is a party to a contract, the statute will be analyzed under the "sovereign acts" doctrine. *See Bowen v. Pub. Agencies Opposed to Social Sec. Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986). This doctrine provides that Congress may abrogate contracts through general legislation, but may not specifically target a class of contracts to which it is a party. *See Resolution Trust Corp. v. FSLIC,* 25 F.3d 1493, 1501 (10th Cir.1994).

■ The flaw in plaintiffs' argument is that the federal government is not a party to these Consent Decrees. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), does not support plaintiffs' contention that state contracts should be treated the same as federal contracts. *Garcia* involved a challenge to the application of the Fair Labor Standards Act to a state entity on the grounds that Congress lacked the power under the Commerce Clause. The Court found that one mechanism through which states could protect their interests from congressional overreaching was their representation of the states in the federal government. *Id.* at 550–52, 105 S.Ct. at 1017–18. However, the fact that state representation in the national legislature is deemed a structural safeguard protecting the states in the balance of federalism concerns does not imply that the states are represented to such a degree that federal legislation benefiting state governments are so tainted by self-interest that heightened scrutiny is required. Plaintiffs

have cited no authority to support such a proposition.

Therefore, under *National Railroad,* rational basis review must be applied. As discussed above, the Court concludes that the PLRA is constitutional under this standard and the provisions of the PLRA at issue here are not "arbitrary and irrational."

### V. *Statutory Construction and Application*

■ Having concluded that the relevant sections of the PLRA are constitutional, the Court must determine how the Act affects the Consent Decrees. Section 3626(b) requires immediate termination of the prospective relief in the Consent Decrees "if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2). The Act places a significant limitation on this provision in the next subsection, however. Section 3626(b)(3) provides that prospective relief should not be terminated "if the court makes written findings based on the record that prospective relief remains necessary to correct a current or ongoing violation of the Federal right" and meets the other requirements set forth in § 3626(b)(2).

Plaintiffs have conceded that the newly required findings were not made when the Consent Decrees were entered in 1978–1979 and in addition, that there is not a record before the Court on which findings could be made that would satisfy the requirements of § 3626(b)(3). Although the plaintiffs, seemingly joined by the United States, ask that the Court postpone a decision on this motion pending an opportunity to create a factual record of the current conditions in New York City jails, the Court is constrained to deny this oral request. The language of the PLRA is clear and, as discussed above, constitutional. The statute provides for "immediate termination" and based on the current record before the Court, the defendants are entitled to vacatur of the Consent Decrees.

The Court notes that two courts have held the automatic stay provisions in § 3626(e) unconstitutional. *See United States v. Michigan*, No. 1:84 CV 63 (W.D.Mich. July 3, 1996); *Hadix v. Johnson*, 933 F.Supp. 1360 (E.D.Mich.1996). While this Court shares some of the concerns expressed by those courts, I need not decide the issue because I have disposed of this motion within the requisite time period.[21]

### CONCLUSION

For the reasons discussed above, the Court concludes that the relevant sections of the PLRA are constitutional. Accordingly, the Consent Decrees in these cases are VACATED pursuant to 18 U.S.C. § 3626(b)(2).

SO ORDERED.

---

**21.** This motion was filed on May 24, 1996. Under § 3626(e), the automatic stay was to go into effect on June 23, 1996. The defendants agreed to treat the Consent Decrees as binding until July 23, 1996 to accommodate the request of the United States for additional time to submit a memorandum of law on the constitutionality of the Act.